BRYAN *v.* AETNA LIFE INS. CO.

(*Knoxville,* September Term, 1938.)

Opinion filed July 1, 1939.

K. E. Steinmetz and Clements & Clements, all of Knoxville, for complainant.

Kennerly & Key, of Knoxville, for defendant.

Mr. Chief Justice Green delivered the opinion of the Court.

This suit was brought by the beneficiary of a life insurance policy, excluding from its coverage death of the insured by suicide within two years from the date of its issue. The Insurance Company defended on the theory that the insured committed suicide. Issues were submitted to a jury and found in favor of the beneficiary. The chancellor rendered a decree upon the verdict, which decree was affirmed by the Court of Appeals. The defendant Insurance Company filed a petition for *certiorari,* which we have granted.

The policy in question was issued on January 14, 1935. Insured met his death on January 3, 1936.

The insured was manager of a loan company located at Knoxville. He was apparently in good health, of cheer-

ful disposition, and the evidence indicates that he was happily married. His widow, the complainant and the beneficiary of the policy, had two children by a former marriage, of whom the insured was said to have been fond. He also had contracted an earlier marriage but had been divorced from his first wife.

The insured drew a salary of $200 a month. Evidence in the case indicates that he had accumulated some property and was worth about $5,000 at the time of his death. Other evidence introduced indicates that some discrepancies were discovered in his accounts after his death. These discrepancies, however, amounted to only $200 or $300, and it is possible that they resulted from irregularities rather than any conscious wrongdoing on the part of the insured. At any rate, these discrepancies had not been discovered during his lifetime, he was not being pressed about them, and he seems to have been abundantly able to adjust them.

The insured had lived in Knoxville but a short while at the time of his death. Previously he had worked in Chattanooga, in Tampa, Florida, and perhaps other places in the same line of business. There is proof indicating that he was not satisfied with his local employment at Knoxville and had made application to another loan company for a similar job shortly before his death without success.

So far as the record shows, there was nothing in the home life or the business life of the insured to make existence unbearable and we are not able to discover a motive for suicide on the evidence appearing in this record.

On the morning of January 3, 1936, the insured left his home in good spirits according to his wife, and reached his office at about eight-thirty, according to the testimony

of employees there. These employees noticed nothing unusual in his demeanor. After being in the office for a few minutes, the insured left to inspect certain property upon which an application had been made for a loan.

Shortly after nine o'clock, at a point on the Ramsey Ferry Road, a few miles out of Knoxville, an automobile was seen by a witness Ford to stop for a few minutes, back up a short distance, and turn off on a road that led from this highway to a place known as the Kreis Dairy Farm. The automobile proceeded along this dairy road for a short distance and stopped on the side of the road. A little later in the morning, the insured was found in this automobile, shot through the head, with a pistol in his hand. An ambulance was summoned, insured still being alive, but he died on the way to the hospital.

The witness Ford, who saw this car stop on the highway and then turn up the dairy road, noticed but one person in the car. The point at which the car came to rest was about 315 feet from the river and from a house boat in which the witness Ford and his family lived. Ford said that the car was within his view during the time it stood on the dairy road. That he was sitting at the window looking at the car almost constantly, only getting up occasionally to go to the stove to spit. He was chewing tobacco. Ford did not see anyone approach or leave the car and, as stated above, he noticed only one person in the car.

Obviously the insured could not have operated this car in the manner in which Ford testified had he received this wound in the head before the car came within Ford's vision. However, although he said he was looking at the car nearly all the time, and evidence indicates that his house boat was a flimsy structure, Ford heard no shot

while the car was stopped on the dairy road or before— the distance of the car from Ford being about 100 yards. The pistol found in the insured's hand was a .32 caliber, long-barreled, Smith & Wesson.

Two witnesses, going to the Kreis Dairy Farm on business, passed the automobile in which the insured was found as that car stood on the side of the dairy road. These witnesses paid no attention to the car or the occupant as they passed. Shortly after they reached the dairy farm, a woman seems to have passed the parked car, noticed something that excited her very much, and came to the farm in a flustered condition. On her report, the witnesses who had previously passed the car went back to make an investigation. They stopped their own car, got out and went to the other car, saw the body of the insured slumped over, the pistol in his hand and pointing out the window. Seeing insured with a pistol, not realizing his condition, the witnesses summoned officers who arrived shortly.

The window on the driver's side of the car was down. All the other windows of the car were closed. There was no broken glass or any sign of a bullet in the car. The clothing of insured did not appear to be disarranged. The proof tends to show that the insured did not own a pistol. Neither did he own an automobile. There is no evidence in the record tending to show to whom the pistol in the insured's hands, or the automobile in which the insured was found, belonged. Nobody knows the owner either of the weapon or of the car.

The body of the insured was sent to his old home in Tampa, Florida, for burial. Some three weeks thereafter, it was disinterred and an examination made of his head by a pathologist, apparently of good qualifica-

tions and experience. This doctor testified as to the course of the ball through the head. It entered on the right side and lodged under the skin on the left side. The doctor removed the bullet and it seems to have been offered in evidence. This witness testified that there were no signs of powder burn about the point of entry of this bullet. That powder burn is a sort of tattoo and does not wash off when a body is prepared for burial. The witness further testified to certain discolorations about the face and eyes of the insured which he seemed to be of opinion resulted from violence, not disintegration. The path of the bullet through the head, in the opinion of the witness, negatived any idea that these discolorations resulted from the gunshot wound.

Evidence was introduced tending to show that the insured was a small man and that he could not himself have held a pistol of the kind found in his hand far enough away from himself to avoid powder burns when such pistol was fired into his head. Only one shot had been fired out of the pistol found and tests were made with this weapon and ammunition showing the distance at which its fire would cause powder burns. These tests tended to support the theory that the insured could not have shot himself with this weapon.

The foregoing are the substantial facts of the case and such being the facts defendant Insurance Company insists that it was entitled to have the chancellor withdraw the case from the jury and render a decree in its favor on the evidence. We think the Court of Appeals properly overruled this contention. It seems to us that reasonable men might draw different conclusions from the proof detailed as to whether the insured killed himself or was killed by another. The ownership

of the car and the ownership of the pistol is enveloped in mystery. The only proof is that neither the car nor the pistol belonged to the insured. It does seem if the owner of the automobile and the owner of the weapon had been innocent of the insured's death, his identity would have been easily established and the insured's possession of these agencies would have been explained. This, together with the absence of powder burns on the insured's head and other circumstances, rendered the case one appropriate for submission to a jury to determine the question of suicide.

■■ The Insurance Company assigns as error the charge of the court below as follows:

"The court further charges you gentlemen of the jury that this presumption against suicide arises even where it is shown by proof that death was self-inflicted, it being presumed to be accidental, until the contrary is made to appear by the preponderance of all the evidence in the case.

"Where circumstantial evidence alone is relied on to prove suicide, the evidence must so preponderate in favor of suicide as to exclude with reasonable certainty any hypothesis of death by accident or by another person, and if it fails to do this, the side claiming suicide fails to maintain that fact."

That portion of the charge set out in the second paragraph above quoted is especially complained of by counsel for the Insurance Company and we think justly. It was error to say that where circumstantial evidence alone is relied on to prove suicide, the evidence must so preponderate in favor of suicide as to exclude with reasonable certainty any hypothesis of death by accident or by another person. This portion of the charge finds sup-

port in certain opinions of the Court of Appeals, none in the opinions of this court. To exclude with reasonable certainty a particular theory or hypothesis means nothing less than excluding that theory or hypothesis beyond a reasonable doubt. In a criminal case resting on circumstantial evidence, the circumstances must be such as to exclude every other reasonable hypothesis than that of guilt. That is, guilt must be proved beyond a reasonable doubt. This, however, is not the rule in civil cases. *McBee* v. *Bowman*, 89 Tenn., 132, 14 S. W., 481; *Knights of Pythias* v. *Steele*, 107 Tenn., 1, 63 S. W., 1126. A preponderance of evidence carries the burden and this is true whether the evidence be direct or circumstantial.

■ The general rule is that it is sufficient in a civil case depending on circumstantial evidence, for the party having the burden of proof to make out the more probable hypothesis and the evidence need not arise to that degree of certainty which will exclude every other reasonable conclusion. 23 C. J. 49; Jones Com. on Evidence, (2 Ed.), Vol. 1, section 12.

Speaking of circumstantial evidence in a civil case, this court said in *Marquet* v. *Aetna Insurance Company*, 128 Tenn., 213, 225, 159 S. W., 733, 736, L. R. A., 1915B, 749, Ann. Cas., 1915B, 677:

"Proof of the essential fact must be had, either direct or positive by witnesses who know the fact, or circumstantial by witnesses who know and testify to facts which tend to establish or prove the essential fact; and only when the circumstances are, in the judgment of the court or jury, such as usually or necessarily attend the essential fact are they sufficient in law to warrant a verdict, judgment, or decree establishing as a fact that which has not been proved by direct or positive evidence."

■ Here is a distinct recognition that circumstances which usually attend the essential fact may be taken as establishing that fact in a civil case.

■ It was formerly held that where the development of a civil case required a charge of crime to be maintained, and the case rested on circumstantial evidence, that the circumstances must be such as to establish the charge of crime beyond a reasonable doubt, or such as to exclude any other reasonable hypothesis than guilt of the crime. This doctrine, however, was repudiated by this court in *Hills* v. *Goodyear*, 72 Tenn. (4 Lea), 233, 40 Am. Rep., 5, and *McBee* v. *Bowman*, 89 Tenn., 132, 14 S. W., 481. In the latter case it was held that a slight preponderance of the evidence was sufficient to prove forgery of a will.

■ In *Provident Life & Accident Insurance Co.* v. *Prieto,* 169 Tenn., 124, 83 S. W. (2d), 251, reference is made to the opinions of the Court of Appeals containing the language used in the second paragraph of the charge above quoted, but these cases are not referred to nor considered nor approved on this particular point. We have repeatedly pointed out that a mere denial by this court of a writ of *certiorari* to the Court of Appeals does not commit us to all the views expressed in a particular opinion. We are primarily concerned on such application with the result reached.

This case was by no means free from doubt on the facts and too much of a burden was placed on the Insurance Company by requiring it to prove suicide to the exclusion of any other reasonable hypothesis, or beyond a reasonable doubt.

Error is assigned upon the refusal of the court to grant three special requests. These requests are as follows:

Special Request No. 1.

"When any substantial evidence is offered tending to prove suicide the presumption against suicide disappears and there remains no presumption either way, and further, that the presumption against suicide is not to be considered by the jury as evidence."

Special Request No. 2.

"The presumption that a violent death was accidental rather than suicidal is not evidence, and may not be given weight as evidence."

Special Request No. 3.

"The presumption that death was not by suicide prevails only in the absence of evidence."

■ The third request was inappropriate inasmuch as there is evidence that death here was not caused by suicide.

■ The first and second requests raise the point considered at length in *Provident Life & Accident Ins. Co.* v. *Prieto, supra,* as to whether the presumption against suicide can be considered as evidence when proof on the subject has been introduced. This question was decided in the affirmative in that case. The court noted the contrary decisions in other jurisdictions but thought it inadvisable to depart from earlier decisions of this court, supported by the weight of authority and laid down certain rules (169 Tenn., at pages 167, 168, 83 S. W. (2d), at page 251) expressing its views as to the treatment of the presumption against suicide. Although contrary views have since been expressed by the United States Supreme Court in *New York Life Ins. Co.* v. *Gamer*, 303 U. S., 161, 58 S. Ct., 500, 82 L. Ed., 726, 114 A. L. R., 1218, apparently inconsistent with its earlier views contained in *Travellers' Ins. Co.* v. *McConkey*, 127 U. S. 661, 8 S.

Ct., 1360, 32 L. Ed., 308, we remain unwilling to overrule our previous cases.

As observed by Special Judge EDWARD J. SMITH in the *Prieto Case*, experience has long since justified the ends for which certain presumptions like the presumption of innocence and the presumption against suicide were called into being and "they should not be discarded, because forsooth in some of their aspects, they may not fit into the framework of logical analysis."

In addition to the many authorities cited and considered in the *Prieto Case*, other decisions considering the presumption against suicide as evidence are collected in Notes in 103 A. L. R., 185 and 114 A. L. R., 1226.

We have a number of decisions that a bare presumption disappears upon the introduction of circumstantial rebutting evidence. *Marquet* v. *Ætna Insurance Co., supra; Brown* v. *Hows*, 163 Tenn., 138, 155, 40 S. W. (2d), 1017; *Central of Georgia R. Co.* v. *Fuller Combing Gin Co.*, 2 Tenn. Civ. App. (2 Higgins), 343.

In a case like the one before us, however, or like *New York Life Ins. Co.* v. *Garner, supra,* where there is evidence pointing to death at the hands of another and evidence pointing to intentional self-destruction, and the jury might have found either way, we do not see the grievous error in failing to instruct the jury that they may give no weight to the presumption against suicide. Authorities so holding sanction the propriety of instructions that the jury may consider the facts out of which the presumption arises and the probabilities to be drawn from those facts as well as other facts in evidence. The sum of the facts upon which the presumption against suicide rests is man's love of life. The weight the jury will give this sentiment or instinct is not likely to be different

whether they consider it as furnishing a probability against suicide or a rebuttable presumption against suicide. Evidence which would in the mind of a juror overcome a probability would likely overcome a disputable presumption.

For the reasons stated, the assignments of error complaining of the refusal to give the special requests are overruled. The assignment of error complaining of the portion of the charge heretofore quoted is sustained. The judgment of the Court of Appeals is reversed and the case is remanded for a new trial.